Good morning. Stephen Wax, Federal Defender for the District of Oregon for Mr. Jones. I think the docket sheet, Deputy Clerk, says AFPD. You are the public defender, aren't you? That's correct. Would you correct that? Thank you. Thank you, Your Honor. This is a case in which the government has pushed a view of constructive possession into guilt by association and beyond any permissible legal limits. It's a case in which the jury, those left after juror misconduct, recognized the issue that was presented by the parties, that is the difference between the control of a vehicle and the control of guns that are possessed by another person within the vehicle. But the jury was not given the proper tools, that is instructions, to do its job. It's a case that's in some respects unusual and perhaps sui generis because the jury has told us through a question and note that it submitted with its verdict what it was struggling with and why it acted as it did and returned the verdict. The history of this case, when you look at the issue, is one in which the jury was misinstructed on the critical issue in the case, the law of possession and mere presence, the issue on which the jury sought clarification but was denied clarification by the court's refusal to provide it in a manner that, in essence, left it with no choice but to convict. And the jury then attached a note to its verdict informing us that it had rejected the government's broad view of the case, its broad view of the events of August 8, 2005, and it found Mr. Jones guilty based only on the facts on which it had sought clarification. Now, focusing in for a moment on this note, we submit that it is an important piece of the case that does limit the review that this court should give to the sufficiency of the evidence argument. We make that argument based on this court's statements in the Hoyle case, and I think that it is very significant that in looking at what happened in Hoyle when the jury attached a note to its verdict telling the parties that it had limited its finding and was unable to resolve certain counts, that on the retrial in that case, when this court said, yes, that was permissible, the government only sought a retrial on, as it turned out, only five of the seven facts on which the jury had said that it had not decided. Notes then of this nature, notes in which a jury says that we have accepted certain facts and rejected others are significant. The district court agreed, and in its review of the evidence, the district court said that its view of the evidence was consistent with the jury's and that it was giving credence to its note. So what is the evidence that this court should review? Well, the first thing that I think that it's important to distinguish is those cases in which the critical issue is knowledge of various players has contrasted with the issue in this case, which is the intent or the existence of dominion and control. This is not a knowledge case. There's no question that Mr. Jones became aware that the guns were in the car and that when he drove away from the police on the bridge, he had that knowledge. The question is, what legally do his acts constitute? Now, looking at the facts, as the court must from the bridge on, in the light most favorable to the government, we start with the fact that Mr. Jones had stopped. He had been driving perhaps five minutes or five miles an hour over the speed limit. He gets to the end of the bridge where it's acknowledged that's the first place that it's safe to stop. He pulls over and stops. The officers get out of their car, and what they see is a man in the back seat frantically trying to open the door and to get out. That man, it turns out, is Mr. Brown, the man who a moment or two later left the car in actual possession of the two guns. I suppose there are at least two ways to look at the events at the end of the bridge. One is that that was the first safe place to stop, and that's the reason he stopped. Another way to look at it, given what happened after that, when the officers got out of the car and started walking towards the car Mr. Jones was driving, the vehicle, he then sped away from the scene, correct? He did leave the scene. There is a dispute about how fast he was going. He left the scene. Certainly a rolling motor vehicle is faster than a couple of officers on foot. Yes. When you combine that with the recorded jail conversation, it's pretty clear why he did that, isn't it? Yes. Because he knew that the two other fellows had guns, and he was going to help them get away. But that does not make him guilty of the possession, and that's the fundamental dispute between the parties here. If you credit, as we believe you should and as the jury should have, the jail statement, those jail statements include two things. First, Mr. Jones saying, not in my car. He is telling us, and the jury was given this by the government, As soon as I found out the guns were there, and he says in his street language, not in my car, not these guns. And I'm getting away, and I'm going to give Dee room to bounce. He is perhaps an accessory after the fact. Perhaps he is engaged in misprision of a felony. But he does not have the intent to control, to possess the guns, which are exclusively in and on the person of Mr. Brown. Now, the question that you began, if I understood correctly, was, what do you do if there are two inferences? And I would refer to the Nevels case, and I would refer to the disagreement between the majority and the dissent there. And what was said there was, you need to look at Vasquez Chan. And if there are two inferences, two plausible inferences, you must give the benefit of the doubt of those plausible inferences to the defendant. And that's what we have here. We have Jones' statements are the only direct evidence of what was taking place in the car. Beyond that, we know Brown is frantic. Is he trying to get out and flee at that point because Jones has told him, not in my car? I'm sorry to be there, counsel. I want to make sure I know a couple of things out of the record. Yes, sir. Jones is driving. Is there somebody sitting in the passenger seat in the front? Yes. One of the officers. Yes, that's Hudson. That's Hudson. All right. So Brown is seated. This is a three-row passenger van. It's a Chevy Astro. I don't know if the third row is there, but yes. Okay. And so Brown is seated in the – is it a bench seat behind the driver? Where he's got access to a sliding panel door on the side of the car. No evidence that it's a bench seat, but it is the seat. Either captain's chairs or a bench seat would be pretty typical. We don't know whether the seats were taken out, but we assume the seats are in it. Correct. But he's seated on the row behind Jones. Do we know where the guns are when Brown's got them inside the car? There is no evidence in this record to that effect. We don't know whether they were within Jones's physical reach. The police officers offered no testimony that they saw any transfer of anything between the front and the back seat, between Hudson and Brown, between Jones and Hudson, or between Jones and Brown. The only evidence is Brown is frantically trying to get out of the car, and then a moment later Brown leaves the car less than a mile down the road, and he has the guns, and he puts them down on the dumpster. That's the only evidence in the record. Now, in looking at the cases that this Court has decided on the instruction issue, and I'm going to try to reserve a couple of minutes for rebuttal if I may, I want to turn to the instruction issue. What the Court told the jury here in the mere presence instruction was that if you find that Mr. Jones was a participant and not a mere spectator, you may consider that. But a participant in what? The failure here is he did not tell them that they needed to find that he was a participant in the crime charged. The possession of the gun, as opposed to the fleeing, the misprison, or the accessory. And the jury's question honed right in on that problem. Your Honor, we are struggling with the definition of reasonable doubt and intent. Can you clarify how Jones would not have control of the guns and vehicle? That was the only issue in the case. The government saying if he has the vehicle, he's in control of the guns. We saying no. And they zeroed right in on that. Right in on the defect in the mere presence instruction to which we had objected. And the only thing the Court said was I... Counsel, we have a number of cases in which we have allowed a conviction to stand in which there was a gun found someplace in the car that was not easily accessible to the driver at the time he was driving. So it may be found under the passenger seat. It may be found under the back seat between the cushions. It may even be in the trunk of the car. The difference between those cases and your case is you've got somebody standing between Jones and the guns. You've got Brown. Yes. Who may or may not be a willing participant in letting Jones have access to those guns. Correct. In your research, are you aware of any similar case in any circuit or district court? I did not find anything that was... Either helped you or hurt you. Correct. What I do find in terms of what I believe helps us is that in those cases in which guns or drugs elsewhere in a car are found to be there are other facts that don't exist here. When the court says in those cases, well, there's other evidence of the joint venture. Right. You're sharing in the proceeds of the drugs and the drugs are on somebody else in the car. Yes. And we just don't have that. Could you focus on the statement that keeps coming up in the briefs and that's from the jail transcript where he talks about, you know, I found out my homeboy was dirty in the car so then I had to let him out to do what he got to do and for him to bounce out and do what he got to do. Yes. In your view, what does that do in terms of not just knowledge but in terms of his participation in what, I guess, that's Brown doing? If this was a case in which there was a joint venture, if we had other facts, if there were facts that said that prior to going down to the view, Jones had said, hey, guys, take the guns. I don't want to be armed. If there was evidence that at the view, Jones and Brown and Hudson were together and had said, hey, you know, let's have a shootout with If there is other evidence, then I think that that statement could support an argument that he is admitting dominion and control of the guns. But in the absence of any such evidence, that statement as I see it admits to being engaged in the misprison of a felony. He is helping him flee. He is not in any way, in any position to do anything with respect to those guns that Brown does not permit. And I would also please refer you to the other portion of that statement. One appears on 703. The other appears on 705 of the excerpt in which he says, not in my car. And if we're going to credit the one statement that the government has offered, I think that both need to be credited. I have one minute left. If I could reserve that, please. Thank you. Thank you for your argument. We'll hear from the United States at this time. Mr. Edmonds? Thank you, Your Honor. Good morning, members of the Court. Tom Edmonds, Assistant United States Attorney. I represent the United States. I will focus in on this possession issue principally because that, I believe, is where the Court has focused its questions. But I think there are some other issues that do need attention. The District Court scrupulously dealt with all of the issues involving his discretion. But to focus on this possession issue, I think a full understanding of the facts is truly necessary, and there's been some minimization here. What happened in that downtown shooting situation was that 50 shots were fired by five different weapons. Two of those weapons, the only weapons on the side that Mr. Jones, Mr. Hudson, and Mr. Brown were on, 20 of those shots were fired by those two weapons that ended up in that van. When the police first see the van, which is leaving the downtown shooting area with its lights out, they're still hearing shots. So the shooting has just occurred, and these three men end up together in a van. They're all Hoover Crip associates of each other. They've known each other. The record establishes that. They were all dressed similarly in provocative gang attire that evening, bright orange colors. As they're leaving the scene, the officers see them below a stop sign at Nato Parkway before they get anywhere near the bridge. On that basis, the officers attempt to stop this vehicle. They think the vehicle's involved in the shooting, and they're right, because the two weapons that are inside that vehicle have been involved in the shooting as the only weapons on that side of the offense. So when the van stops, and I think, Judge Hawkins, you point out that there is an alternative explanation, that the reason for stopping on the bridge there was to allow Brown to get out to dispose of the weapons over the bridge. And when the officers get behind the van, Mr. Brown is seen frantically trying to get out of the van. I didn't follow that. You think that Jones is trying to allow Brown to get rid of the guns over the bridge? You mean into the river? Into the river down below. Why would he stop on the other side? I thought he didn't stop on the bridge. He did stop at the far end of the bridge. Right. Why did he stop in the middle of the bridge? If you really wanted to give him a chance to throw it in the river, why did he stop at the far end of the bridge instead of in the middle of the bridge? Well, I think the circumstances would suggest, Your Honor, that they were surprised by being followed by the police and that what's going on between the three of them is some discussion about what to do, and he stops at the point that he does. I mean, this is all your conjecture. Well, I think it's circumstantial evidence that supports it. But the conjecture that's been added here, that he stopped out of an abidance to law enforcement, I don't think is at all clear in the record. Because the officers get out, hold the van at gunpoint, and shout commands for the occupants to raise their hands. No one complies. Mr. Jones is looking back towards Mr. Brown and the officers. They can see him through the back windows of the van. And the defendant doesn't comply with the commands. Instead, it's his brain and his foot that takes control of that van and the destiny of those weapons when he presses the accelerator and guns away from those officers. And we know exactly what he intended to do on the basis of the statement that's in that jail phone call. On that theory, counsel, he would be responsible for anything that either Mr. Hudson or Mr. Brown were carrying in their pockets, wouldn't he? No, not on that theory, because his statement in that phone call is clear that he knew what was involved was guns. So he'd be responsible for anything that he knew they might be carrying on them. I don't say that. If Jones says, I don't want to get caught here, I've got marijuana in my pocket, and Jones guns the car, then is Jones also guilty of possession of marijuana? He could be in that circumstance, and this is why. Because the Chambers and Jackson case, which I believe are a brick wall to any reversal in this case on sufficiency of evidence, are exactly on point with that. Those cases say that the efforts of a driver assisting a passenger in disposing of evidence, and Chambers involved the passenger throwing 2 kilograms of cocaine out the passenger window, and the defendant was found guilty of possession with intent to distribute 2 kilograms of cocaine. He'd never held onto the cocaine, but he was convicted of that. Part of a joint venture? It was part of a joint venture, and I submit to you that we have a joint venture here very clearly, that these 3 gang members who've just been involved in this shooting, who've just flooded the scene of this shooting, who know what's going on, are part of a joint enterprise, and that they're working together. And Mr. Jones' statement on the phone call, Your Honor, is absolutely crystal clear evidence of that. Jones was apprehended a few moments after the bridge stop scenario, right? He fled at a high rate of speed. He'd gunned the van away. But there came a time when the van hit a dead end or whatever. It was stopped. Yes. And Jones was apprehended. The clearest picture that you would have is at GSER 13. There's a photograph of where he was stopped. It's a fence across the road that Mr. Jones would not have known about. He stopped the van there, and Mr. Brown then was able to get out. Here's the point of my question. Jones is apprehended pretty quickly. Brown is also? Brown gets out of the van and ditches the weapons on a dumpster. He's found by a canine within 10 minutes. They're both in custody? Yes. What about Hudson? Hudson's taken into custody. At about the same time? Yes. He and Mr. Jones stay in the van. Were any of the three tested for gunshot residue on their hands? They were here. Not on their hands. Not on their hands. On their clothing. On their clothing. And what was the result? Was that admitted at trial? It was. And there was gunshot residue on Mr. Jones' clothing. Okay. Now, the evidence is sufficient. And as I submit, I believe Chambers and Jackson and the Shirley case, all cases that are strong precedents in this circuit, are simply a bar to the view that defendant takes. The statements that are in the record from those tape-recorded phone calls are stronger evidence than was existent in Chambers and Jackson, because Chambers and Jackson just involved the circumstantial facts of the driver driving the vehicle and the passenger throwing cocaine and heroin out of the window. In this case, we not only have the disposal of the evidence with a clear expression of Mr. Jones saying that was his intended purpose, was to give Brown room to bounce, to get rid of the weapons. We also have this tape-recorded statement on top of what you had in Chambers. And Chambers and Jackson survived scrutiny on sufficiency of evidence, and I submit to you that this case is stronger on those facts that we have before the court. I would like to turn to the jury now to issue a mere presence. Just quickly before you do that, other than the cases, and the cases are important and we'll certainly consider them, can you point to any fact which takes Jones' behavior after the bridge stop and fleeing that scene? Fact that elevates it beyond aiding and abetting a getaway, aiding and abetting the possession, misprison of a felon, any of the things that Mr. Wax has talked about? Well, I think the elements of possession of a firearm are independent of those other facets, and this was not an aiding and abetting theory. We submitted to the jury that Mr. Jones actually participated in the crime by controlling the destiny of those weapons. Frankly, Your Honor, Mr. Jones, at the time that he accelerated away from those officers who had the van at gunpoint, was the primary participant in controlling the destiny, the disposition of those firearms away. The Disla case, Chambers, Murray, they all talk about the power of disposition, and the power of disposition here was entirely in Mr. Jones' control at that stage. Now, you wanted to move to the jury issue. I would like to move just quickly to the mere presence instruction. It was argued by counsel. So, you know, I'm interested in the 11-person jury issue. Thank you, Your Honor, and I will move to that very quickly. I simply want to say that the district court was entirely appropriate and exercised impeccable discretion in reading the uniform instruction here. There's nothing defective about it. This conflating of the participant issue from the instruction to the jury note simply didn't occur. There was no jury note that evidenced confusion about that word participant. The only way that word participant can be understood to apply to anything is to the crime of unlawful possession of a firearm. At page 42 of Mr. Wax's brief, that instruction is in black and white. And there is no suggestion that that instruction allows the jury to conclude that the word participant relates to driving, there's no mention of that, or to any other physical act. Participant grammatically and commonsensically applies only to the crime of unlawful possession of a firearm. And so I submit that that was appropriate. The instruction that defense counsel submitted to the court was in error. That instruction, which is just above it at page 42, said that association with the scene of a crime, contraband, or persons engaged in criminal activity cannot lead to a criminal conviction. That's not the law. It can lead to a criminal conviction. Association and presence can be considered as circumstantial evidence. It can't be the only foundation of the conviction. But that's simply an erroneous instruction crafted by defense counsel without any basis in the law. And so it was perfectly appropriate for Judge Mossman to reject the reading of that instruction, and he did read the instruction that was appropriate. I want to turn to the 12-person jury issue because that is important to your consideration, and I believe that this issue focuses most importantly on the words that Mr. Wax spoke to the district court at the time the waiver was made. And if the court wants to look at this with me, I believe it's page 44 of my second paragraph of what counsel said to Judge Mossman. He said, my position remains that there should be a mistrial. I do see that under the rules we have an alternative remedy that is available under the rules in an 11-person jury, and I've discussed with Mr. Jones whether or not he would waive his right to a 12-person jury. He advises me that he would. There are some things I want to point out specifically about the words that were used by Mr. Wax in that submission to Judge Mossman. Twice he refers to the rules. It infers very strongly that he has looked at the rules. He says, I do see that under the rules. And I'm sure that the court is asking the question, how could an experienced trial judge, a prosecutor, and a defense attorney not be aware of this issue? Well, there is some obscurity, I think, to the 12-person jury issue. Even if there's obscurity, my question really goes beyond that. In the heat of trial, everybody doesn't remember to do everything. But there's at least one Fourth Circuit case that suggests it's structural error, although in that case the person affirmatively objected to going forward with the 11-person jury. But the rule is written quite clearly about a written waiver. And if the rule is to mean anything so that we don't have to rely just on counsel representation, why wouldn't we proceed to simply enforce the rule as written? Well, Your Honor, I don't believe in this case that it was structural error. You have noticed the obvious distinction between Carbello and this case. In that case, the trial judge compelled the parties to go forward with 11, which was clearly an error at the time that he did it mid-trial. He had no power to do that under the rule. This isn't structural error. This may be procedural error, nonconstitutional procedural error, as the district court found. But my submission about what Mr. Wax said, I believe, ties in completely with the government's submission here that this case is controlled by the invited error doctrine. The Ahmaud case is on all fours with this particular situation. It was the defendant and the defendant alone who initiated this move to waive a 12-person jury. No one else suggested it. He raised it on his own. The trial judge didn't propose it. The government didn't propose it. It was defense counsel and his client who had 20 minutes to confer about this issue during a recess who raised it first, and then there was a voir dire of the second juror who was involved in this issue, and then there was this submission by Mr. Wax that he was representing, that he and his client had discussed this, and that Mr. Jones was ready to waive his right to the 12-person jury and proceed with 11 of his own choosing. Mr. Wax concedes in his submissions at the time of the new trial motion that this was a strategic decision on his part. He says, I make no bones about it. That's at ER 1108. And in his brief, he says it wasn't a tactical decision, strategic, tactical. He admits that it was, and it was a strategic or tactical decision to get rid of Juror Walker to proceed with the 11 that he wanted. And I believe on the record you have before you, you have evidence that points to the fact. I mean, what does it do for us to argue whether it was strategic or tactical if, in fact, you have this situation put in front of the court with these jurors talking to the witness? I mean, he didn't create that situation. The defendant didn't create that situation. No, he didn't, but I submit that. He's got to do something about the situation. Well, and Judge Mossman did, Your Honor, and I believe Judge Mossman treated this issue appropriately. He dismissed the one juror who had made the offending comment. He voir dired the second juror who had not made the comment. It's very arguable that that second juror's involvement was de minimis. It was a fleeting conversation about where they'd come from in California, some joking about the fact that he fueled airplanes at the airport. Upon her return, her plane would be fueled. Nothing more was said by that particular juror, and totally different than the Caliendo situation, where there had been a 20-minute conversation, and in Caliendo the witness who was involved was the key witness for the state. He was the only witness that mattered. He had been the recipient of a confession by the defendant, and the entire case rested on him. Ms. Kaminsky, the expert witness in this case who was involved, was a shared witness in the sense that she had been hired by both the prosecution and defense. Her evidence really wasn't in dispute. In fact, defense counsel, in closing argument, on a couple of occasions relied upon Ms. Kaminsky's testimony to exculpate his own client. So there was nothing in dispute about her that qualifies her in the same realm that the Caliendo witness was. You're over your time and need to wrap up. I will, Your Honor. I want to finish by saying that there are a number of areas here that have been challenged, most of which involve the exercise of discretion by the trial court. Judge Mossman exercised scrupulous attention to detail. The defendant received a fair trial. And I'll make a final point about Reyes, that Reyes really hinged on the fact that the court there believed that the defendant had simply gone along with his lawyer and really hadn't exercised a personal and intelligent waiver. That's in the last page of that opinion. And that is very distinguishable from the situation where Mr. Jones was part of that decision, where his counsel, a long-experienced defense lawyer, was making the representation he did. And I believe the judgment of the district court should be affirmed. Okay. Thank you. Thank you. Rebuttal, and let's put two minutes on the clock. Thank you, Your Honor. Mr. Edmonds begins by talking about the downtown shooting. His next phrase is gang association. And then he says the three men were just involved in the shooting. That's the problem with the government's position in this case. The jury rejected those facts. So in answer to the question, what other facts are there? The government, as we see it, continues to persist in a view of the facts that the jury rejected. With respect to chambers, and the government saying it's on all fours, the facts in chambers include the driver gets out of the car and runs, and a wad of cash falls out of his pocket. In that case, as in all the others on which we have focused, there are other facts showing the participation in the joint venture by the defendant who was complaining about the sufficiency of the evidence. Do we have evidence, though, that Jones had gun residue on his clothes? Yes. And that is another one of my points to get to. On pages 866 through 867 of the excerpt, the expert explicitly and specifically says that the volume of shots in the downtown area would produce a cloud, if you will, and that there's a lot of testimony from Detective Rhodes and others as to where the shell casings are found. Mr. Jones ran right past and or through location of the shots. Kaminsky says that's how the gunshot residue gets on his clothes. 866 to 867. So in the jury's determination that Mr. Jones should not be and was not found culpable for participation in the shooting, they would have credited what Ms. Kaminsky had said. There are innocent explanations for the presence of the residue on his clothes. The jury accepted that, and we respectfully submit that this Court should not undo what the jury has done in our respect. Thank you both for your arguments. The case just argued will be submitted for decision.
judges: Hawkins, McKeown, Bybee